UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SARAH WISNIEWSKI,

      Plaintiff,

                                   Case No. 10-13580

-vs-                                Hon: AVERN COHN

PONTIAC SCHOOL DISTRICT, and
DARRIN McALLISTER,

      Defendant.

_____/

## MEMORANDUM AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. 22)

### I. Introduction

This is an employment discrimination case under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.* (Title VII) and the Elliot-Larson Civil Rights Act (ELCRA), M.C.L. 37.2103 *et seq.* Plaintiff Sarah Wisniewski is suing her former employer, Pontiac School District (Pontiac) and former co-worker Darrin McAllister (McAllister), claiming sexual harassment and retaliation.[1] The complaint is in seven counts: (I) Violation of Title VII Quid Pro Sexual Harassment; (II) Violation of ELCRA Quid Pro Sexual Harassment; (III) Violation of Title VII Hostile Work Environment; (IV)

_____

[1]  Wisniewski claims violations of Title VII against Pontiac only and violations of the ELCRA against both defendants.  Because Wisniewski's claim of civil assault applies only to McAllister it will not be considered.

Violation of ELCRA Hostile Work Environment; (V) Violation of Title VII Retaliation; (VI) Violation of ELCRA Retaliation; and (VII) Civil Assault.[2]

Now before the Court is Pontiac's motion for summary judgment (Doc. 22).  For the reasons that follow, the motion is **GRANTED** in part and **DENIED** in part. Wisniewski's claims of quid pro quo sexual harassment and retaliation against Pontiac, counts (I), (II), (V), and (VI) are **DISMISSED**.

## II. Background

### A. General

The material facts as gleaned from the parties' papers follow. Pontiac hired Wisniewski in August 2008 as a police authority officer (PAO). Beginning in 2008, PAOs managed the security in Pontiac public schools. August 2008 marked a restructuring of school security.  Pontiac moved from employing school police officers to employing PAOs. Chief Darryl Cosby (Cosby) was the supervising officer of the PAOs; he made the hiring and retention decisions.[3]  Cosby hired eighteen (18) of the PAOs on August 11, 2008, three (3) of whom worked under the previous system. The remaining PAOs were hired between August and late October for a total of twenty-four (24) PAOs.

### B. Madison Elementary

Cosby first assigned Wisniewski to Madison Elementary School.  The placement was short lived. According to Cosby, the principal at Madison complained that Wisniewski was too aggressive with the children.  Additionally, Cosby says Wisniewski

---

[2] McAllister has been served (Doc. 16) and (Doc. 17).  However, no appearance was entered on his behalf.  Wisniewski asked the Court for a Clerk's Entry of Default (Doc. 18) which was granted (Doc. 19) and served (Doc. 20).
[3] Cosby indicated in his deposition that he made employment decisions in conjunction with human resources personnel.  Cosby determined school assignments.

complained that she could not get along with fellow PAO Eric Ott or Madison's principal. Wisniewski says she offended the principal when she interviewed a student after a fight despite principal's instructions to the contrary.  Wisniewski reports that she left Madison at her own request because of friction with the principal and Ott.

### C. Lincoln & Jefferson Middle Schools

Next, Cosby assigned Wisniewski to Lincoln Middle School.  This placement was also short lived.  During her tenure at Lincoln, Cosby disciplined Wisniewski for several incidents. The first involved "inappropriate language" toward a student.  Cosby relates that a student called Wisniewski "cuz."  In response, Wisniewski replied, "I'm too white to be your cousin." A parent who heard the exchange complained to school administration. Wisniewski was counseled and reprimanded.

Next, Wisniewski received a reprimand for failure to follow PAO procedure and protocol.  Wisniewski responded to reports of a fight and entered the fray without calling for backup first, as dictated by PAO procedure. While attempting to break up the fight, Wisniewski was assaulted and lost possession of her radio and mace. Wisniewski was "written up" for this infraction. Additionally, similar to Madison's principal, Cosby says Lincoln's principal complained that Wisniewski was too aggressive with the students and asked for her removal.

Next, Cosby sent Wisniewski to Jefferson Middle School where she served for approximately two days. Cosby says Jefferson's principal demanded her transfer because she was "too aggressive with students" and "caused unnecessary troubles."

### D. Pontiac Northern High School

Wisniewski's fourth assignment was Pontiac Northern High School (PNHS), where she worked from December 2008 to March 2009. In March 2009 to the end of the school year, Wisniewski was reassigned as a floater responsible for security for the elementary schools. Cynthia Tucker was Wisniewski's "team leader" at PNHS. Tucker's report of Wisniewski's job performance is unflattering. Tucker "wrote up" Wisniewski several times and recommended her termination. Tucker says Wisniewski often reported to work unkempt and in violation of uniform standards. Specifically, Wisniewski arrived with an unclean uniform, unclean hair, and often smelled of alcohol and cigarettes. Wisniewski says Tucker unfairly targeted her because she was white. According to Cosby, she requested a transfer out of Northern. According to Wisniewski, Cosby moved her at McAllister's insistence.

### 1. McAllister's Harassment

### a. Initial Relationship With Wisniewski

McAllister was one of the Pontiac Police Department's (PPD) liaison officers assigned to the school district; he worked in conjunction with the PAOs at Northern. Formally, McCallister reported to a superior officer in the PPD although his salary was funded by the school district. Nevertheless, Wisniewski argues that in practice McAllister was in charge.[4] According to Ott, Cosby told the PAOs (regarding McAllister's authority), "when a person has that much experience you better fucking listen to them

---

[4] In support, Wisniewski relates an incident where Cosby chastised her for not obeying a directive from McAllister. Cosby denies that he ordered Wisniewski to obey orders from McAllister. Wisniewski also says that if she disobeyed McAllister he would scream at her and threaten to tell the chief.

4

as if you were listening to me." In addition, Ott says that Cosby threatened to fire anyone who disobeyed McAllister and issued this warning publically on more than one occasion.

Wisniewski says that during the first several weeks at Northern, she carried on a flirtation with McAllister. During this period, Wisniewski says McAllister began to make sexual jokes and comments, first discreetly but later openly in front of fellow PAOs and students. For example, Wisniewski says McAllister grabbed her hand to rub it with lotion and told her "you have pretty eyes." Near the end of December, the flirtation culminated when Wisniewski performed oral sex on McAllister in his patrol car. Wisniewski says that the sex act was fully consensual.

After returning from Christmas vacation, the other PAOs learned that fellow PAO Marcus Steed and Wisniewski spent time together over the break. Apparently, Steed spent the night at Wisniewski's home, although she denies they had a sexual relationship.  Nevertheless, the relationship between Steed and Wisniewski caused the rest of the PAOs to speculate and gossip. During one of these sessions, McAllister remarked, "if I had slept on her couch I would have gotten something. It might have been a rape charge, but I would have got something." Wisniewski later said she thought McAllister was angry with her because he believed she was dating Steed.

### a. Deterioration of Relationship

In early January 2009, after she and McAllister drove a student home from school, Wisniewski again performed oral sex on McAllister in his patrol car. This time, however, Wisniewski says she felt pressured and that the act was not fully consensual.

5

Wisniewski does not allege that McAllister used force or the threat of force, although she says she felt as if her job was in jeopardy if she did not participate.

After the second encounter, the dynamic between the two shifted dramatically. Wisniewski says that McAllister's comments became lewd and aggressive.  According to Wisniewski, McAllister made constant reference to his genitals, asking her whether she wanted to see "the mule." On one occasion, Wisniewski says McAllister made this remark in the security office at Northern in front of a fellow PAO and a student. When the PAO and student left the room, Wisniewski says McAllister exposed his penis.

According to Wisniewski, there were two incidents involving McAllister's taser.[5] The first, McAllister used the laser pointer of his taser to illuminate Wisniewski's body parts, for the amusement of fellow PAOs. The second forms the basis of Wisniewski's claim of civil assault against McAllister. According to Wisniewski, McAllister screamed in her face and threatened her with his taser after Wisniewski refused to bring him paper towels.

Wisniewski says McAllister taunted her in front of students and co-workers by making gestures with his hands to simulate masturbation. On one occasion, he purported to explain the difference between the genitals of a white women and women of color while pointing at her crotch. Wisniewski says McAllister intimated to students that they had a romantic relationship. In addition, Wisniewski says McAllister publically announced he would ejaculate on her face to "mark his territory."

At one point, Wisniewski sought the counsel of her union representative.  He told her that there was no "grievable offence" and if she pursued a complaint, she would

---

[5] Tucker asserts that McAllister has used his taser on children at Northern but McAllister did not report these incidents.

6

only come across as a "woman scorned."  Wisniewski reported McAllister to Cosby in June 2009. After reporting him, Wisniewski says McAllister told her to quit and threatened to arrest her.

## 2. Other Northern PAOs

The following is a list of incidents Wisniewski says she endured while working at PNHS. For several of the incidents Wisniewski relates statements but does not identify the speaker.

a.  PAOs questioned Wisniewski about her sexual preferences and history.

b.  PAOs publically speculated whether she had sex with Steed.

c.  Cosby instructed her to stand and turn around in front of the other PAOs for a uniform inspection.

d.  Timmy Bracewell, a fellow PAO, told Wisniewski to "get on her knees."

e.  After Wisniewski mentioned that a past boyfriend had passed away, Bracewell commented, "Sarah has got a killer coochie."[6]

f.  PAOs teased Wisniewski for growing up in Northville and because she was a "white girl from the suburbs."

g.  PAO Derek Odneal remarked, "Sarah might not look good to you now, but wait 'till you're my age and you'll want to hit that."

h.  Other PAOs at PNH refused to answer her radio calls for assistance.

i.  Wisniewski says Tucker targeted her because she was white.

j.   PAOs publically discussed sexual encounters between Wisniewski and McAllister, commenting that he "would break that white girl off."

_____

[6] Slang for "vagina."

7

k.  Wisniweski was told by other PAOs that she was not tough enough for the job and she should quit.

l.   After reporting harassment to Cosby in June 8, 2009, Wisniewski says when she walked into the security office the other PAO's would say "you have stop talking, Sarah's here."

m. PAOs commented on her body parts, saying "Sarah doesn't have an ass, she has a booty" and referring to her lips as D.S.L.s (which stood for "dick sucking lips").

n. Wisniewski says she endured daily taunting, sexual innuendo, and insult.

### 3. Cosby

The first incident to come to Cosby's attention was on or about February 2, 2009. Several days prior, Cosby singled out Wisniewski for a uniform inspection during a meeting of the PAOs. Later Cosby heard rumors that Wisniewski was offended.[7] Wisniewski says that after the uniform inspection she told two other PAO's she felt uncomfortable turning around because members of the PAO team had made comments about her body in the past. Additionally, someone relayed a rumor to Cosby that Wisniewski said Cosby was "checking out her ass."

Cosby ordered Wisniewski to his office on February 2, 2009 to discuss the uniform inspection incident.[8] According to Wisniewski, she admitted that she felt uncomfortable when Cosby asked her to stand up and turn around. With respect to the previous comments that made her uncomfortable, Wisniewski identified Bracewell and

---

[7] See *supra* Section II(C)(2)(c).

[8] Cosby said: "I ordered her to me."

Ott as the PAOs who made remarks about her body.[9] Cosby asked Wisniewski to write a statement detailing the incidents and informed her he intended to conduct an investigation regarding Bracewell and Ott's comments.

Wisniewski wrote a statement. However, she qualified her statement by writing "I'm being ordered to give up names [sic] [and] things that were said. I do not want to." Wisniewski then related the comments made by Ott and Bracewell. She goes on to report that a fellow officer called her "easy" and said that one hundred dollars ($100) would buy them an hour with Wisniewski. Wisniewski also explained there was public speculation about her sex life. Wisniewski said she took responsibility for the situation because she had not communicated to her co-workers that their comments bothered her. Finally, at the end of her statement Wisniewski asserts her "*Garrity* rights,"[10] although her reason for doing so is unclear.

Cosby subsequently disciplined Ott and Bracewell for their comments to Wisniewski. With respect to the uniform inspection that initiated the inquiry, Wisniewski denied that she said Cosby was "checking out her ass." However, Ott asserts that Cosby made a statement about Wisniewski's hips during the uniform inspection that was incorrectly attributed to him.

On June 8, 2009, Cosby prepared a memo recommending Wisniewski's termination to the director of human resources. Regarding the investigation above, Cosby wrote: "[w]hile at PHN [Pontiac Northern], she became involved in a rumor scandal with two other male officers that she initially claimed were sexually harassing

---

[9] See *supra* Section II(c)(2)(d)(e).

[10] *Garrity v. New Jersey*, 385 U.S. 493 (1967) (holding the 5th and 14th amendments protected a public employee from making potentially incrimination statements during an employment investigation).

9

her. However, after an investigation the allegations were not only unfounded, but in a statement of her own, she indicated she accepted responsibility for what had taken place and how she handled it."  When asked about this statement during his deposition Cosby engaged in the confusing exchange that follows:

> Q. Okay. And, the two male officer are Ott and Bracewell?
> A. Yes.
> Q. So you didn't find her allegations truthful, did you?
> A. Oh, yes, I did find them truthful.
> Q. You say here they're unfounded
> A. I didn't mean unfounded
> Q. That's what it says right here.  It says "unfounded."
> A. I found it to be untruthful.

In his deposition Cosby says the next time he heard of harassment was June 8, 2009 when Wisniewski came to his office and told him "I want to tell you that McAllister is harassing me and the reason why is because I quit sleeping with him and starting sleeping with Marcus Steed."  That day Cosby submitted a four-page memorandum to the human resources department detailing Wisniewski's problems over the school year and recommended her termination. In the memorandum, Cosby says, "PAO Wisniewski then began to complain of not only being picked on by the Team Leader (Tucker) but also made complaints of being harassed by Pontiac Police Officer D. McCallister. I then met with Mr. Reed (Wisniewski's union representative) and created a new position and assignment for Wisniewski." (parenthesis in original). Wisniewski was reassigned in March. It is difficult to square this statement with Cosby's deposition testimony where he indicated that sexual harassment first came to his attention on June 8, 2009. Cosby said:

10

[t]he first time I heard or it came to my attention that Sarah was being harassed was by Sarah. That would have been, I believe, in June, towards the end of the school year. And, I think it was June, because I immediately, after the conversation I had with her, prepared a memo. And, that was the first time I was informed that she was being harassed.

Additionally, Tucker and Ott both say that they brought complaints of Wisniewski's harassment to Cosby before June.[11]  Cosby denies this.  Tucker says she told Cosby that Wisniewski and McAllister had a sexual relationship that ended badly and McAllister was enraged and treating Wisniewski harshly. Tucker says she related to Cosby that McAllister made derogatory and sexual comments toward Wisniewski prior to her transfer to the elementary schools in March 2009. During her deposition, Tucker testified to the following:

Q: Now, did you also tell Cosby about McAllister's conduct as it related to harassment towards [Wisniewski]?
A. Yes, ma'am, I did.
Q. And did Cosby do anything?
A. No, it was like a joke. I told him that we could be sued because she was highly upset…Chief knew about the incidents and knew what was going on…he told me, don't worry about it, she is going to be fired.

Ott says that he brought Wisniewski's allegations of sexual harassment to Cosby on several occasions in the spring of 2009.[12]  Ott says Cosby responded with comments of "that fucking bitch is crazy,"  "that's why the bitch was moved is because the bitch caused too many problems," and "if that bitch had kept her fucking legs closed none of this would have happened."  Ott says that Cosby cautioned him not to bring further complaints regarding sexual harassment of Wisniewski to him warning "[i]f you keep

---

[11] The precise dates are unclear.

[12] Ott was president of the union that represented the PAOs. Ott was not recalled from layoff.  Cosby contends this is based on an incident where he was untruthful with the PPD after being pulled over for an expired license plate.

bringing me this fucking shit, I'm going to fire your black ass too." Ott further says that Cosby promised to "fire that bitch." According to Ott, approximately a week later he asked Cosby again what he planned to do about McAllister's behavior, to which he responded "not a motherfucking thing."[13]

In his June 8, 2009 memorandum, Cosby relates his response to Wisniewski's complaints when she came to his office that day. "I attempted to stop her from sharing her personal life with me as I indicated I was not interested in knowing however she insisted on telling me as she indicated it was the only way I would understand what was going on." Cosby's accounts of when he knew of McAllister's behavior are inconsistent. Further, his account is in direct conflict with Ott and Tucker's testimony.

### E. Transfer to Elementary Schools

In March 2009, Cosby transferred Wisniewski out of PNHS. Wisniewski says the transfer (to the elementary schools) foreclosed her opportunity to earn overtime and was thus an adverse employment decision.[14] Cosby says the transfer came at Wisniewski's request because she said she could no longer work at PNHS. Cosby says that Wisniewski thanked him for reassigning her out of PNHS.

Despite another move, complaints about Wisniewski's performance continued. In late March, one of the elementary school administrators complained that Wisniewski was on the computer playing solitaire, rather than performing security duties. Again, in late April, a school administrator complained to Cosby that Wisniewski was playing

---

[13] It is unclear from the record exactly when these conversations are alleged to have taken place beyond the general description of "spring."

[14] Wisniewski has not submitted evidence to indicate how much, if any, overtime she worked while at Northern.

solitaire, this time while a fight erupted in another part of the school. Cosby observed the same behavior and confronted Wisniewski. Cosby says Wisniewski replied "you caught me."

## F. Layoffs

In late June, Pontiac issued layoff notices to the vast majority of its workforce, including all the PAOs.[15] Pontiac laid off employees to allow it the flexibility to reduce its personnel based on its decreasing and uncertain budget. Out of the twenty-four PAOs, the district recalled seventeen for work the following school year. Wisniewski, Ott, and Tucker were among the PAOs not recalled to work.

## III. Defendant's Motion for Summary Judgment

Pontiac now moves the Court for summary judgment, arguing that Wisniewski's quid pro quo claims fail as a matter of law, her hostile work environment claims are unsupported by evidence, and she was not recalled based on her poor work performance not in retaliation for complaining about harassment. Wisniewski contends that summary judgment is inappropriate, as there are material facts in dispute that must be resolved by a jury.

## IV. Legal Standard

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to

---

[15] Cosby explains that he was not laid off and suggests some non-union management personnel were not subject to layoffs.

find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The nonmoving party may not rest upon his pleadings; rather, the nonmoving party's response "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Showing that there is some metaphysical doubt as to the material facts is not enough; "the mere existence of a scintilla of evidence" in support of the nonmoving party is not sufficient to show a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Rather, the nonmoving party must present "significant probative evidence" in support of its opposition to the motion for summary judgment in order to defeat the motion. *Moore v. Philip Morris Co.*, 8 F.3d 335, 340 (6th Cir. 1993); see Anderson, 477 U.S. at 249–50.

## V. Discussion

### A. Quid Pro Quo Sexual Harassment[16]

Wisniewski's quid pro quo claim centers on her affair with McAllister**.** A successful claim of quid pro quo sexual harassment requires:

> 1) [t]hat the employee was a member of a protected class; 2) that the employee was subjected to unwelcomed sexual harassment in the form of sexual advances or requests for sexual favors; 3) that the harassment complained of was on the basis of sex; 4) that the employee's submission to the unwelcomed advances was an express or implied condition for receiving job benefits or that the employee's refusal to submit to the supervisor's sexual demands resulted in a

---

[16] The state law analog to Title VII, ELCRA, often parallels federal interpretations of Title VII, but the statutes do diverge. *Chambers v. Trettco, Inc.*, 463 Mich. 297 (2000). However, the issues disputed here are analyzed under the same framework. Specifically, ELCRA requires "(1) that she was subject to any of the types of unwelcome sexual conduct or communication described in the statute, and (2) that her employer or the employer's agent used her submission to or rejection of the proscribed conduct as a factor in a decision affecting her employment."

14

tangible job detriment; and 5) the existence of *respondeat superior* liability.[17] *Bowman v. Shawnee State University*, 220 F.3d 456, 461 (6th Cir. 2000).

### 1. Welcome or Unwelcome

A successful quid pro quo claim requires that the sexual advance or request was unwelcome. This is a distinct inquiry from whether the sex was voluntary. "[T]he fact that sex-related conduct was "voluntary" in sense that complainant was not forced to participate against her will, is not a defense to sexual harassment suit brought under Title VII…the gravamen of any sexual harassment claim is that alleged sexual advances were unwelcome." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986) (citing 42 U.S.C.A. § 2000e *et seq.*).

Wisniewski must have indicated by her conduct that McAllister's sexual advance was unwelcome and evidence that she "engaged in behavior similar to that which she claimed was unwelcome or offensive" is evidence that the behavior was not unwelcome. *Scusa v. Nestle U.S.A. Co.*, 181 F.3d 958, 966 (8th Cir. 1999). Wisniewski had two sexual encounters with McAllister. Wisniewski's claim of quid pro quo sexual harassment centers on her second sexual encounter with McAllister; she says the first was voluntary. Thus Wisniewski would have had to indicate she was no longer interested in a sexual relationship with McAllister prior to the second encounter.

Both sexual encounters with McAllister occurred during a period of flirtation and within the span of a few weeks. Although Wisniewski now asserts she felt pressured to perform the second act, she does not explain why her understanding of their

---

[17] The parties do not dispute the first, third, or fifth elements therefore the Court will not address them.

relationship changed so dramatically.[18] Further, Wisniewski has not advanced evidence to suggest she communicated to McAllister that a continued sexual relationship was unwanted.

### 2. Job Benefits/Detriments

### a. McAllister's Authority

The fourth element of Wisniewski's quid pro quo claim raises two issues. First, whether McAllister was in a position to control job benefits or detriments. Second, if so, whether their sexual encounter was conditioned on receipt or denial of such benefits.

Wisniewski's first hurdle is that McAllister was not her supervisor. "[T]he party engaged in quid pro quo harassment is almost always, by definition, a supervisor." *Hartleip v. McNeilab, Inc.*, 83 F.3d 767, 775 (6th Cir. 1996) (quoting *Champion v. Nationwide Security, Inc.*, 450 Mich. 702 (1996)). McAllister and Wisniewski are more aptly characterized as co-workers, although McAllister worked for the police department, not the school district. Under Title VII, a "supervisor" has the authority to hire, fire, transfer, and promote. 42 U.S.C. §2000e *et seq.* Wisniewski does not argue that McAllister possessed such authority.

Wisniewski says that McAllister had defacto authority because of his friendship with Cosby. However, the record contains nothing to suggest McAllister hired, fired, transferred, or promoted anyone. Wisniewski says McAllister influenced her transfer from PNHS. Influence, however, is not authority. Because McAllister was not a "supervisor" within the meaning of Title VII and did not control job benefit or detriments, his behavior cannot form the basis of a quid pro quo claim.

---

[18] The record is unclear as to whether rumors about Wisniewski and Steed happened before or after the second sexual encounter.

16

### b. Promise or Threat

Even if influence alone was sufficient, nothing in the record indicates McAllister made a threat or promise to induce Wisniewski to perform oral sex, which is the essence of a quid pro quo claim.

### 3. Causal Link

Finally, it is unclear how Wisniewski could establish a causal relationship between compliance with McAllister's sexual request and her termination in the context of a quid pro quo claim. *Hartleip,* 83 F.3d at 775 (explaining the plaintiff must tie a *refusal* of sexual advances with the adverse employment decision.)  Wisniewski has not demonstrated a causal link between her sex acts with McAllister and her termination.

Other federal courts have noted, "negative employment actions which follow on the heels of a consensual relationship gone sour do not constitute quid pro quo sexual harassment unless they are linked in some way to other or further 'unwanted' sexual advances." *Campbell v. Masten*, 955 F.Supp 526, 530 (D.C. M.D. 1997) (citing *Keppler v. Hinsdale Township High School Dist.* 86, 715 F.Supp. 862 (N.D. Ill. 1989)). McAllister made no sexual advances after their relationship soured in January.

The decision not to recall Wisniewski was not made by McAllister. Because McAllister was not Wisniewski's supervisor any sex act with him was not a condition of employment. Finally, there is no causal link between her termination and the encounter with McAllister. Wisniewski's quid pro quo claim fails as a matter of law.

### B. Hostile Work Environment

Next, Wisniewski claims she was subject to a hostile work environment. A hostile work environment exists where the workplace is "permeated with discriminatory

intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  A hostile work environment violates Title VII. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986).

To establish a claim for hostile work environment Wisniewski must show she is the member of a protected class (this is undisputed), she was subjected to unwelcome harassment, the harassment was based on her gender, and the harassment affected a term, condition, or privilege of employment.  In addition, she must show Pontiac knew or should have known of the conduct and failed to take preventative or corrective actions. *Michael v. Caterpillar Fin. Services Corp.*, 496 F.3d 584, 600 (6th Cir. 2007).

### 1. Sufficiently Severe or Pervasive to Alter Working Conditions

For sexual harassment to be actionable under Title VII it must rise to the level of severe or pervasive, a few isolated incidents will not suffice.  *Morris v. Oldham County Fiscal Court*, 201 F.3d 784 (6th Cir. 2000). For example, a co-worker exposing his genitals and making several rude comments was not severe or pervasive enough to create a hostile work environment. *Gwen v. Regional Transit Authority*, 7 Fed.Appx. 496 (6th Cir. 2001). In contrast to the isolated incidents in *Gewn*, Wisniewski says she endured daily taunting, innuendo, insult, and sexual comments. The conduct Wisniewski describes rises above a series of isolated or mildly offensive incidents. Given the frequency and offensiveness of the conduct, it was severe and pervasive.

### 2. Unwelcome Harassment

Next, the harassment must be both subjectively and objectively offensive.  *Harris*, 510 U.S. at 22. Wisniewski describes feeling tormented and humiliated by the behavior

of her co-workers. She also describes experiencing anxiety that caused her to pull over and vomit on her way to work. However, Wisniewski admitted to participating in some of the raunchy banter. Moreover, she did not report the conduct she now says she found offensive. In her February statement, Wisniewski minimized Ott and Bracewell's comments. Further, she did not report any of McAllister's behavior to Cosby until June, after she was already transferred out of PNHS.

### a.  Subjectively Offensive

Wisniewski describes feeling humiliated by the way she was treated. Nevertheless, Pontiac contends that because Wisniewski's sexual encounters with McAllister were consensual and that she engaged in sexual banter that the conduct was welcome. However, the sexual encounters with McAllister do not form the basis of Wisniewski's hostile work environment claim. Further, even if Wisniewski initially participated in sexual banter and did not discourage it, this does not warrant the conclusion that the behavior was welcome.

The Seventh Circuit considered a situation where the plaintiff's participation in the offensive conduct was significantly greater than Wisniewski's. *Carr v. Allison Gas Turbine Div., General Motors Corp.*, 32 F.3d 1007 (7th Cir. 1994). In *Carr* the plaintiff engaged in profanity, name calling, and viewing pornography, she put her hand on the thigh of a younger co-worker, and had shouting matches with co-workers. The district judge described Carr as contributing as much abusive and crude behavior as the males in her shop. *Id.* at 1010-11. Nevertheless, her participation did not demand a finding that the behavior she endured was welcome.

19

If, as Pontiac suggests, the conduct was not unwelcome because Wisniewski was an active participant, at best a question of fact exists which requires a trial for resolution. However, it is unlikely Wisniewski's initial sexual banter with co-workers invited the subsequent public humiliation she describes.

### b.  Objectively Offensive

Next, a successful claim requires the conduct be objectively offensive. The record contains evidence of conduct that would offend a reasonable person. The incidents Wisniewski describes, such as demeaning sexual comments made in the presence of co-workers and children would offend a person of normal sensibilities several times over.

### 3. Gender Based v. Personal

The lion's share of the offensive conduct came from McAllister, with whom Wisniewski had a failed affair. This fact raises the question of whether McAllister's behavior was personal or gender based. Personal animosity is not uncommon when a relationship ends. However, offensive conduct following a consensual relationship can form the basis of a successful hostile work environment claim. *Green v. Administrators of Tulane Educational Fund*, 284 F.3d 642 (5th Cir. 2002) (overruled on other grounds) (gender based harassment was the manifestation of the personal animosity). Wisniewski's history with McAllister does not exclude his conduct from the equation.

The behavior Wisniewski describes, including McAllister's, is explicitly sexual and based on her identity as a woman. According to Wisniewski, co-workers discussed her body parts, speculated on her sexual activity, and joked about sex acts. The comments directly implicate her status as a woman and therefore are gender based.

20

### 4. Pontiac's Knowledge

An employer who takes "prompt remedial action" in response to sexual harassment can avoid liability under Title VII. *See Fenton v. Hisan, Inc.*, 174 F.3d 827, 831 (6th Cir. 1999). It appears Cosby took steps to investigate and punish inappropriate behavior after the incident in February. The February investigation began on Cosby's initiative and he addressed Ott and Bracewell's comments. However, it is not clear when Cosby learned of the harassment from February to June 2009. The conduct from February to June is the basis of Wisniewski's claim.

Cosby says the first he heard of problems with McAllister was when Wisniewski brought it up on June 8, 2009. However, Cosby's own testimony conflicts on this point.[19] Additionally, Cosby's recollection is in direct conflict with the testimony of Ott and Tucker. Both Ott and Tucker (who was the team leader) say they brought McAllister's harassment to Cosby's attention prior to June. Ott says that Cosby warned him not to pursue sexual harassment complaints and made it clear he would not punish McAllister. When Cosby knew of the harassment is a fact very much in dispute. The timing of Cosby's knowledge of the harassment is a question of material fact that prevents summary judgment.

---

[19] *See Supra* §2(D)(3)

## C. Retaliation[20]

### 1. Prima Facie Case

Wisniewski's final claim is that she was not recalled in retaliation for reporting sexual harassment. The elements of a prima facie case of retaliation under Title VII are:

> (1) that plaintiff engaged in an activity protected by Title VII; (2) that the exercise of his [or her] civil rights was known by the defendant; (3) that, thereafter, the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action. *Christopher v. Stouder Memorial Hosp.*, 936 F.2d 870, 877 (6th Cir. 1991).

Opposing a practice made unlawful by Title VII in this case, sexual harassment is a protected activity. 42 U.S.C. § 2000e-3(a). The only factor in dispute is four (4) the causal connection between Wisniewski's protected activity and her non-recall. Wisniewski says she was not recalled because of her complaints about sexual harassment. Pontiac asserts she was not recalled because of her poor performance during her employment and therefore cannot establish a causal link.

### 2. Adverse Employment Decision

Preliminarily, a non-recall after a layoff can serve as an adverse employment decision. In the context of the First Amendment, the Supreme Court has recognized failure to recall as the basis of a retaliation claim. *Rutan v. Republican Party of Illinois*,

---

[20] Wisniewski's claim of retaliation under ELCRA is analyzed under the same framework as retaliation under Title VII. "The language of the Michigan act parallels that of 42 U.S.C. § 2000e, and where the two acts are similar, Michigan courts treat federal precedents as 'persuasive, albeit not binding, authority.'" *Lulaj v. Wackenhut Corp.*, 512 F.3d 760 (6th Cir. 2008) (quoting *Pena v. Ingham County Road Com'n*, 255 Mich. App. 299 (Mich. Ct. App. 2003).

497 U.S. 62, 75 (1990).[21] Other federal courts have acknowledged non-recall as the basis of a Title VII retaliation claim. *Smith v. BMI, Inc.* 957 F.2d 462 (7th Cir. 1992); *Cox v. United States Gypsum Co.*, 409 F.2d 289, 290 (7th Cir. 1969). Although, Wisniewski's initial layoff was not discriminatory (Pontiac laid off all its PAOs) this does not prevent her non-recall from serving as an adverse employment decision.

### 3. Causation: Temporal Proximity of Adverse Action to Complaint of Harassment

Retaliation may be inferred when an adverse employment action closely follows a protected activity." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). There is no bright line rule, however, the Sixth Circuit has found a period of four months insufficient to make out a prima facie case of retaliation. *Cooper v. City of North Olmsted*, 795 F.2d 1265 (6th Cir. 1986). The Sixth Circuit has also found a period of three months sufficiently close in time to raise an inference of retaliation. *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 563 (6th Cir. 2004).

The same day Wisniewski reported sexual harassment to Cosby he sent a memorandum recommending her termination to human resources. The timing of that memorandum raises an inference of retaliation. However, the June 8, 2009 memorandum is arguably not the measuring point. The adverse employment decision was Wisniewski's non-recall, which happened about a month later. A month is also sufficiently close in time to raise an inference of retaliation. In either case, the timing raises an inference of retaliation.

---

[21] "We therefore determine that promotions, transfers, and recalls after layoffs based on political affiliation or support are an impermissible infringement on the First Amendment rights of public employees."

### 4. Non-Discriminatory Reason for Non-Recall

If Wisniewski can make out a prima facie case of retaliation the *McDonnell-Douglas* burden shifting formula applies (in the absence of direct evidence of discrimination). *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The burden then shifts to Pontiac to offer a legitimate non-discriminatory reason for Wisniewski's termination. If Pontiac can offer a legitimate reason for her termination, the burden shifts back to Wisniewski to demonstrate the proffered reason is pretextual. *Jackson v. Pepsi-Cola, Dr. Pepper Bottling Co., a Div. of RKO Bottlers of Toledo, Inc.*, 783 F.2d 50, 54 (6th Cir. 1986).

To demonstrate pretext, Wisniewski must show that Pontiac's explanation had no basis in the facts, did not actually motive its conduct, or was insufficient to warrant the challenged conduct. *Browning v. Dept. of the Army*, 436 F.3d 692, 695 (6th Cir. 2006). Pontiac points to the problems listed above in §V(C)(3)(a) as the reasons for Wisniewski's discharge.

### a. Basis in the Facts: Wisniewski's Record

Pontiac employed twenty-four PAOs at the close of the 2008-2009 school year. Due to the Pontiac's declining enrollment and budget difficulties, it recalled only seventeen PAOs. Faced with the task of laying off seven PAOs, Cosby would not have recalled Wisniewski based on her job performance alone. Three different principals accused her of being too aggressive with children. She had problems interacting with co-workers and school administrators from her first assignment through her fifth. Wisniewski committed a serious breach of procedure while attempting to break up a fight and suffered an assault as a result. Wisniewski's supervisor reported she appeared

24

for work unclean and smelling of alcohol. Cosby had to transfer Wisniewski four times during the course of the school year. Finally, school administrators observed her playing solitaire rather than working.

### b. Motive

In calculating the plausability of Wisniewski's non-recall based on her performance it is useful to consider the records of the other POAs as a comparison. Wisniewski points to infractions committed by PAOs who were recalled to support her contention that her non-recall was retaliatory. Specifically, Wisniewski points to Alfreda Gilyard and Bracewell as officers who were recalled but had a more serious disciplinary history than she did. Both were subject to "formal" disciplinary actions. Gilyard was suspended for two days because she failed to come to the aid of a fellow officer and then submitted her incident report late. Bracewell had a verbal altercation with a school administrator and signed his time card "6:00" when he in fact arrived at "6:03." Bracewell received a suspension for the verbal altercation.

Wisniewski asserts because she was never subject to formal discipline or suspension her employment record was better than that of Bracewell and Gilyard. This argument is unpersuasive. Wisniewski's record contains many serious incidents, because none resulted in a suspension does not change the evaluation of her record.

Wisniewski's record is objectively worse than other officers who were not recalled, including both Ott and Tucker. Cosby cited concerns with honesty as the motivating factor in their non-recall. Cosby says Ott had an incident where he identified himself during a traffic stop as a Pontiac police officer rather than a police authority

25

officer. Tucker made a complaint about McAllister that Cosby says was untrue.  Even if both PAO's lied, as Cosby contends, these incidents were far less serious than the Wisniewski's performance problems.

As Wisniewski points out, "a causal link requires the plaintiff to proffer evidence 'sufficient to raise the inference that her protected activity was the likely reason for the adverse action.'" *Zanders v. National R.R. Passenger Corp.*, 898 F.2d 1127 (6th Cir. 1990) (internal citations omitted). Given the weight of her misconduct, the reasonable inference is that she was not recalled because of her poor job performance.

Wisniewski does not dispute the performance problems leveled against her, thus Pontiac's explanation has a basis in fact. Second, Cosby was faced with the situation where he could not recall all of the PAOs, as discussed above, Wisniewski's employment record put her at the bottom of the list. She cannot demonstrate the motive of her non-recall was retaliatory when she was not next in line for recall. Finally, Wisniewski's poor employment record was more than sufficient to justify her non-recall. Wisniewski has not demonstrated that Pontiac's proffered reasons for her non-recall are pretextual.

### VI. Conclusion

The case goes forward on Count (III), Violation of Title VII Hostile Work Environment and Count (IV), Violation of ELCRA Hostile Work Environment.  The case

manager will schedule a status conference to discuss preparation for the final pretrial statement and a trial date.

**SO ORDERED**.

Dated:  March 2, 2012                              s/Avern Cohn
                                                   AVERN COHN
                                                   UNITED STATES DISTRICT JUDGE


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, Friday, March 2, 2012, by electronic and/or ordinary mail.

                                                   s/Julie Owens
                                                   Case Manager, (313) 234-5160

27